Case 0:07-cv-61885-MGC   Document 1   Entered on FLSD Docket 12/27/2007   Page 1 of 31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

**07-61885 CIV-COOKE**

HANNAH BATIHK,                                    CASE NO.: _____

    Plaintiff,

v.                                               MAGISTRATE JUDGE _____

WCI COMMUNITIES, INC. and
REVIER REAL ESTATE CORP
d/b/a RE/MAX PARTNERS,

    Defendants.

_____/

## COMPLAINT

The Plaintiff sues the Defendants and states:

### Jurisdiction and Venue

1.    This is an action arising under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 et ceq., ("ILSA") as well as pendent state court claims. Jurisdiction is appropriate pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1719.

2.    The Plaintiff, Hannah Batihk ("Batihk"), is an individual over eighteen years of age, a resident of Broward County, Florida and is otherwise *sui juris*.

3.    Defendant Revier Real Estate Corporation d/b/a Re/Max Partners ("Re/Max") is a Florida corporation with its principal place of business in Broward County, Florida, doing business in Broward County, Florida, and is otherwise *sui juris*.

4.    At all times material hereto, non-party Tony Ryan ("Ryan") was and agent and representative of Defendant Re/Max.

5.    Defendant WCI Communities, Inc. ("WCI" or "Developer") is a Delaware

corporation doing business in Broward County, Florida and is otherwise *sui juris*.

      6.      At all times material hereto, non-party Amy Silverman ("Silverman") was and agent and employee of Defendant WCI.

      7.      Venue is proper in this Court 15 U.S.C. § 1719because Defendants transact business in Broward County, Florida, the real property that is the subject of this action is located in Broward County, Florida, and the offer and sale of the real property that is the subject of this action occurred in Broward County and the Southern District of Florida.

### Factual Allegations

      8.      Defendant WCI is the developer of Parkland Golf & Country Club ("Parkland" or the "Development") located in Parkland, Florida.

      9.      In late September 2005, Developer's employee and representative, Silverman, contacted Ryan, a real estate salesman for Defendant  Re/Max, and promoted the Development to Ryan.

      10.      Ryan then contacted Plaintiff Batihk and promoted the Development to her. Thereafter, Plaintiff met with Ryan and Silverman.

      11.      Plaintiff Batihk told Ryan that she could only purchase a property in the Development if she received mortgage financing, and that she could not possibly afford to purchase property in the Development without lender financing.

      12.      On October 4, 2005, Plaintiff Batihk executed a contract for the purchase of real property (the "Agreement") known as "Lot 9-R" of Parkland Golf & Country Club (the "Property").  When she executed the Agreement and shortly thereafter, Batihk delivered

2

approximately $125,000.00 to WCI as an earnest money deposit for the purchase of the Property. A copy of the Agreement is attached hereto as Exhibit "A."

13.     Prior to executing the Agreement, Plaintiff Batihk and Defendant Ryan, an agent of Defendant Re/Max, agreed that Ryan would review the Agreement on behalf of Plaintiff to insure that Plaintiff was adequately protected in the Agreement.

14.     Plaintiff relied on Ryan's and Re/Max's expertise in real estate to assist her in the transaction, and entered into the Agreement in reliance on Ryan's review of the Agreement and his representation to her that it was "ok" for her to enter into the Agreement.  When Ryan reviewed the Agreement and told Plaintiff it was "ok," Ryan knew that Plaintiff could not close in an all cash transaction, and that she needed mortgage financing in order to close.

15.     Thereafter Plaintiff was denied mortgage financing and was therefore unable to close on the purchase of the Property.

16.     Defendant WCI paid a real estate commission to Defendant Re/Max and kept the remainder of the approximately $125,000.00 paid to it by Plaintiff as an earnest money deposit.

17.     All conditions precedent to this action have occurred or been waived.

### Count I – ILSA (§1703(a)(1))

18.     Plaintiff realleges paragraphs 1-17 as if set forth herein.

19.     Parkland is a subdivision as defined by 15 U.S.C. § 1701(3).  Parkland consists of more than 100 lots offered, marketed, promoted and sold to the public through the U.S. Mail, U.S. telephone lines, and other instrumentalities of interstate commerce as part of a common promotional plan as defined in 15 U.S.C. § 1701(4).

3

20.    Developer is a developer as defined in 15 U.S.C. § 1701(5) in that Developer is a person who, directly or indirectly, sells, offers to sell, and advertises for sale units in a subdivision.

21.    Defendant Re/Max is an agent of a developer, as defined in 15 U.S.C. § 1701(6).

22.    Prior to selling the Property to the Plaintiff, Developer did not file a statement of record with the Secretary of the Department of Housing and Urban Development, as prescribed in 15 U.S. C. §§ 1703(a)(1)(A), 1704 and 1706.

23.    Prior to selling the Property to the Plaintiff, Developer did not provide Plaintiff with a printed property report, as prescribed in 15 U.S. C. §§ 1703(a)(1)(B) and 1707.

24.    Exemptions to the registration and reporting requirements of ILSA are set forth in 15 U.S. C. § 1702.  Developer is not exempt from the filing and registration requirements described in the preceding paragraphs.

25.    In the Agreement, the Developer also failed to inform the Plaintiff that she had the right to revoke the Agreement at anytime within two years after entering into the Agreement, as required by 15 U.S. C. §§ 1703(c).

26.    On April 24, 2007, less than two years after Plaintiff entered into the Agreement, Plaintiff sent a letter to Developer revoking the Agreement, a copy of which is attached hereto as Exhibit "B."  Nevertheless, Developer refused to return Plaintiff's earnest money deposit to her.

27.    Plaintiffs are entitled to revocation of the Agreement pursuant to 15 U.S.C. §§ 1703.

WHEREFORE Plaintiff demands judgment against Defendant WCI revoking, canceling

4

and rescinding the Agreement and ordering Defendant WCI to return all deposits, with interest, to the Plaintiff, or alternatively for damages and further equitable relief against all Defendants as appropriate, as well as attorneys fees' pursuant to 15 U.S..C § 1709(c) and the Agreement, and such further relief as this Court deems just and proper.

<u>**Count II – ILSA (15 U.S.C § 1703(a)(2))**</u>

28.     Plaintiffs reallege paragraphs 1-17 and 19-24 as if set forth herein.

29.     Developer, through its agents, Silverman and Ryan of Re/Max, represented to Plaintiff that Developer would construct roads, sewers, water, gas, electric service, and recreational facilities at Parkland. Indeed, the Developer represented that the Development's recreational amenities would include an "event lawn," "resort-style" pool, six "Har-Tru" tennis courts, a botanical garden, "landscape art," and entry features depicted in Developer's marketing and promotional materials.

30.     The Agreement failed to stipulate that the Developer would provide and complete the amenities described in the preceding paragraph.

31.     Instead, the Agreement merely provided that Developer could change the size, configuration, dimensions and/or location of the "amenities, green space, entrance or common area," and further stated that the "entry feature" was "subject to revision."

32.     Developer's failure to stipulate in the Agreement to build the amenities described above constitutes a violation of 15 U.S..C § 1703(a)(2)(D).

33.     Plaintiff is entitled to damages and/or equitable relief for Defendants' violation of ILSA.

5

WHEREFORE Plaintiff demands judgment against Defendant WCI revoking, canceling and rescinding the Agreement and ordering Defendant WCI to return all deposits, with interest, to the Plaintiff, or alternatively for damages and further equitable relief against all Defendants as appropriate, as well as attorneys fees' pursuant to 15 U.S..C § 1709(c) and the Agreement, and such further relief as this Court deems just and proper.

### Count III – ILSA (15 U.S.C § 1703(b)

34.    Plaintiff realleges paragraphs 1-17 and 19-24 as if set forth herein.

35.    In the Agreement, Developer failed to notify Plaintiff that she had until seven (7) days after she signed the Agreement to revoke the Agreement.

36.    Developer's failure to notify Plaintiff in the Agreement of her seven (7) day right of revocation constitutes a violation of 15 U.S..C § 1703(b).

37.    Plaintiff is entitled to revocation of the Agreement.

38.    On April 24, 2007, less than two years after Plaintiff entered into the Agreement, Plaintiff sent a letter to Developer revoking the Agreement, a copy of which is attached hereto as Exhibit "B." Nevertheless, Developer refused to return Plaintiff's earnest money deposit to her.

WHEREFORE Plaintiff demands judgment against WCI revoking the Agreement and ordering WCI to return all deposits, with interest, to the Plaintiff, as well as attorneys fees' pursuant to 15 U.S..C § 1709(c) and the Agreement, and such further relief as this Court deems just and proper.

6

## Count IV – ILSA (§1703(d))

39.     Plaintiff realleges paragraphs 1-17 and 19-24 as if set forth herein.

40.     In the Agreement, Developer failed to provide Plaintiff with a notice of default and 20 day opportunity to cure such default.

41.     Developer's failure to provide Plaintiff with a notice of default and 20 day opportunity to cure such default constitutes a violation of 15 U.S..C § 1703(d)(2).

42.     On April 24, 2007, less than two years after Plaintiff entered into the Agreement, Plaintiff sent a letter to Developer revoking the Agreement, a copy of which is attached hereto as Exhibit "B." Nevertheless, Developer refused to return Plaintiff's earnest money deposit to her.

43.     Plaintiff is entitled to revocation of the Agreement.

WHEREFORE Plaintiff demands judgment against WCI revoking the Agreement and ordering WCI to return all deposits, with interest, to the Plaintiff, as well as attorneys fees' pursuant to 15 U.S..C § 1709(c) and the Agreement, and such further relief as this Court deems just and proper.

## COUNT V – IMPOSITION AND FORECLOSURE OF VENDEE'S LIEN

44.     Plaintiff realleges paragraphs 1-43 as if set forth herein.

45.     Plaintiff and Defendant entered into the Agreement.

46.     Plaintiff properly revoked the Agreement, and is entitled to the return of her earnest money deposits, as alleged above.

47.     Defendants have refused to return the earnest money deposit to Plaintiff.

48.     Because the Plaintiff did not receive the return of her earnest money deposit, she

7

continues to have an equitable interest in the Property. Plaintiff owns and holds her equitable lien on the Property.

49.    Plaintiff has recorded, or will soon be recording, a *lis pendens* to secure her earnest money deposit and her equitable interest in the Property.

50.    Plaintiff is entitled to an equitable lien on the Property to secure her earnest money deposit paid to Defendant, as well as to foreclose the equitable lien to satisfy and repay Plaintiff her earnest money deposit.

WHEREFORE Plaintiff demands judgment imposing an equitable vendee's lien on the Property and foreclosure of her equitable lien, as well as attorney's fees pursuant to the Agreement, and such further relief as this Court deems just and proper.

## Count VI – Professional Negligence/ Malpractice
(Against ReMax Only)

51.    The Plaintiff re-alleges paragraphs 1-17 as if set forth herein.

52.    Defendant Re/Max, through its agent and representative, Ryan, contacted the Plaintiff and proposed that she purchase the Property. Re/Max and the Plaintiff agreed that Re/Max would represent the Plaintiff and protect her interests in the negotiation of the Agreement and purchase of the Property.

53.    Re/Max knew that the Plaintiff was relying on it, through Defendant Ryan, to protect her interests, and further knew that Plaintiff could not close without mortgage financing for the purchase of the Property.

54.    Re/Max had a legal duty to protect the Plaintiff from injury based on its agreement

with her to do so.

55.     Re/Max failed to perform its' duty to protect the Plaintiff's interests by failing to have the contract be contingent upon Plaintiff obtaining mortgage financing.

56.     Re/Max's conduct and representation of the Plaintiff was negligent and fell below the standard of care required of real estate brokers in Broward County, Florida.

57.     The Plaintiff has been damaged by Re/Max's negligence and breach of the duty of care owed to the Plaintiff.

WHEREFORE Plaintiff demands judgment against Defendant Re/Max for damages resulting from Re/Max's negligence and professional malpractice, together with such further relief as this Court deems just and proper.

## Count VII – Breach of Fiduciary Duty
(Against ReMax Only)

58.     The Plaintiff re-alleges paragraphs 1-17 and 52-57 as if set forth herein.

59.     Defendant Re/Max, through its agent and representative, Ryan, contacted the Plaintiff and proposed that she purchase the Property.  Re/Max and the Plaintiff agreed that Re/Max would represent the Plaintiff and protect her interests in the negotiation of the Agreement and purchase of the Property.

60.     Plaintiff reposed trust and confidence in Re/Max, through Defendant Ryan, to protect her interest in negotiating a contract with Defendant WCI and including provisions in the Agreement making the Agreement contingent upon Plaintiff being approved for financing.

61.     Re/Max accepted the trust and confidence reposed in it by the Plaintiff.  As a real

9

estate broker, Re/Max owed its principal, the Plaintiff, a duty of trust, confidence, good faith and loyalty.

62.     Re/Max, through Defendant Ryan, knew that the Plaintiff was relying on it to protect her interests, including the Plaintiff's right to have the Agreement be contingent upon her obtaining mortgage financing for the purchase of the Property.

63.     Re//Max breached and abused the trust and confidence reposed in it by Plaintiff and the fiduciary duty it owed to Plaintiff by failing to have the contract be contingent upon Plaintiff obtaining mortgage financing, while at the same time failing to disclose this fact to Plaintiff.

64.     The Plaintiff has been damaged by Re/Max's breach of fiduciary duty.

WHEREFORE Plaintiff demands judgment against Defendant Re/Max for damages resulting from Re/Max's breach of fiduciary duty, together with such further relief as this Court deems just and proper.

December 20, 2007

By: s/Joseph E. Altschul
JOSEPH E. ALTSCHUL, ESQ.
Florida Bar No.: 0867470
E-Mail address: jea@bellsouth.net

JOSEPH E. ALTSCHUL, LLC
2717 W. Cypress Creek Road
Fort Lauderdale, FL 33309
(954) 556-4821 – Telephone
(954) 343-5600 – Facsimile

# Exhibit

# "A"

BROWARD COUNTY CGC: 0000936

## PARKLAND GOLF & COUNTRY CLUB
## RESIDENCE PURCHASE CONTRACT

THIS RESIDENCE PURCHASE CONTRACT (this "Contract"), is made and entered into on the date written below, by and between WCI COMMUNITIES, INC., a Delaware corporation ("Seller"), whose address is 24301 Walden Center Drive, Bonita Springs, FL  34134 and the purchaser(s) named below ("Purchaser"). The effective date of this Contract shall be the last date on which this Contract shall be signed by Seller or Purchaser (the "Effective Date")

Purchaser: *Hannah Bashit*

Purchaser: _____

Purchaser Address: _____

Purchaser Phone: (Home) _____     (Local) _____

(Business) _____     (Telecopier) _____

Residence (Homesite Number): *9/R*          Model Type: *SantaLane spanish right garage*

1.      PURCHASE AND SALE. For and in consideration of the mutual covenants, conditions and restrictions, contained in this Contract, and other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, Seller agrees to sell and Purchaser agrees to purchase, upon the terms and conditions of this Contract, the real property described as:

[If this Contract is executed prior to the time a plat has been recorded, check here (___), use paragraph A below, and attach the Platting Rider and Site Plan as **Exhibit 1A**.]

A.      Lot _____, Block _____ as set forth in accordance with the "Site Plan" attached hereto as **Exhibit 1-A** and incorporated herein by this reference (the "Homesite"), together with a residential dwelling unit to be constructed thereon by Seller or its affiliates (the Homesite and the residential dwelling unit are collectively referred to as the "Residence") located within the Community known as Parkland Golf & Country Club (the "Community"). The Residence will be built substantially in accordance with the plans and specifications for the Model Type described above as maintained in the office of Seller and available for review during normal business hours until such time as a model is built. A list of standard features for such Model Type is attached hereto as **Exhibit 1-B** and incorporated herein by this reference. The Homesite, the subject of this Contract, at the sole option of the Seller, under applicable law, may be included within the boundaries, and subject to the jurisdiction, of a local government called a community development district whose single and special purpose is to provide basic systems, facilities and services to property within its jurisdiction.

**OR**

[If this Contract is executed after a plat has been recorded, check here (___) and use paragraph B below.]

B.      Lot *9*, Block *R* as set forth on that certain plat designated as Parkland Golf & Country Club Plat and recorded in Plat Book *174*, Pages *137* inclusive, in the Public Records of Broward County, Florida (the "Homesite"), together with a residential dwelling unit to be constructed thereon by Seller or its affiliates (the Homesite and the residential dwelling unit are collectively referred to as the "Residence") located within the Community known as *Parkland Golf & Country Club* (the "Community"). The Residence will be built substantially in accordance with the plans and specifications for the Model Type described above as maintained in the office of Seller and available for review during normal business hours until such time as a model is built. A list of standard features for such Model Type is attached hereto as **Exhibit 1-B** and incorporated herein by this reference. The Homesite, the subject of this Contract, at the sole option of the Seller, under applicable law, may be included within the boundaries, and subject to the jurisdiction, of a local government called a community development district whose single and special purpose is to provide basic systems, facilities and services to property within its jurisdiction.

Purchaser acknowledges that (i) Homesite is within an area of the Community which is not subdivided as of the date hereof, (ii) Seller is not obligated to provide a metes and bounds description of the Homesite and (iii) Purchaser is satisfied with describing the Homesite by the sketch attached to the Contract as Exhibit 1. Purchaser further acknowledges that the proposed site plan for the Community as of the date hereof (the "Site Plan") is subject to the City of Parkland review and approval and such approval may be contingent upon Seller modifying the Site Plan (by way of example but not limitation: modifying the size, configuration, dimensions and/or location of the Homesite depicted on Exhibit 1, amenities, green space, entrance or common area).  Said modifications shall not

cause a recalculation of the Total Purchase Price described in Section 2 of the Agreement. Notwithstanding the foregoing, in the event the final dimensions of the Homesite differs materially and adversely from the sketch depicted on Exhibit 1, Purchaser shall have the right but not the obligation to terminate the Contract within five (5) business days of Purchaser's receipt of the approved Parkland Golf & Country Club Subdivision Plan and Seller shall promptly return the Deposit to Purchaser. As hereinafter provided, Seller may sign any documents necessary for such subdivision or site plan approval as attorney-in-fact for Purchaser. To the extent that the documents for such subdivision or site plan approval require the joinder of the owners in the Community, Seller, by its duly authorized officers, may, as the agent or the attorney-in-fact for Purchaser, execute, acknowledge and deliver such documents (including, without limitation, any consents or other documents required by any governmental agencies in connection with such subdivision or site plan approval), and Purchaser, by virtue of the acceptance of the Deed, irrevocably nominates, constitutes and appoints Seller, through its duly authorized officers, as Purchaser's proper and legal attorneys-in-fact for such purpose. Said appointment is coupled with an interest and is therefore irrevocable. Any such documents executed pursuant to this Section 1 may recite that it made pursuant to this Section 1. Notwithstanding the foregoing, Purchaser agrees, by its acceptance of the Deed, to execute or otherwise join in any petition and/or other documents required in connection with such subdivision or site plan approval. The provisions of this Section 1 shall survive the Closing and delivery the Special Warranty Deed.

2.      PURCHASE PRICE AND PAYMENTS. The "Total Purchase Price" for the Residence, exclusive of any Closing costs, options (if any), adjustments and other costs described in this Contract, is as follows:

| | | | |
|---|---|---|---|
| 2.1. | Purchase Price: | | |
| 2.1.1. | Base Price: | $ | _978,990.00_ |
| 2.1.2. | Homesite Premium: | $ | _85,000.00_ |
| 2.1.3. | Permit-Related Options: | $ | [To be determined] |
| 2.1.4. | Initial Options: | $ | [To be determined] |
| | TOTAL PURCHASE PRICE OF RESIDENCE | $ | _1,063,990.00_ |
| 2.2. | Payments: Purchaser shall make the following payments in U.S. Dollars: | | |
| 2.2.1. | Initial deposit (including reservation deposit, if any) | $ | _53,200.00_ |
| 2.2.2. | Additional deposit to bring total deposits up to 10% of total price due on _____ | $ | _11/2/05→53,199.00_ |
| 2.3. | Balance due at Closing: | $ | _975,591.00_ |
| | TOTAL: | $ | _1,063,990.00_ |

WITHOUT LIMITING ANY OTHER PROVISION HEREIN, IF ANY DEPOSIT IS NOT TIMELY PAID, PURCHASER WILL BE IN DEFAULT. Deposits may be paid by bank checks or personal checks. Deposit checks are accepted subject to collection. The balance due at Closing shall be paid, at Seller's election, in the form of a federal wire transfer or a cashier's check drawn on a bank in the county in Florida in which the Homesite is located. Official checks, bank checks or personal checks will NOT be accepted for payment of the balance of the Total Purchase Price payable at Closing.

3.      Deposits. Any reference to Initial Deposit, Additional Deposit, Deposit or Deposits herein shall refer collectively to all amounts deposited with Seller under this Contract, and under any addendum or amendment hereto, except for any deposits or payments made by Purchaser for options, extras and/or upgrades. Any and all deposits or payments for options, extras, and/or upgrades are non-refundable except (a) in the event of Seller's default, (b) if the Residence is damaged, as described in Section 34 hereof, and Seller does not elect to repair or replace the Residence and/or (c) Seller is unable to provide marketable and insurable title as required by Section 8 hereof. If the Deposit is held in escrow, it shall be released to Seller upon written notice from Seller to the escrow agent that Purchaser has defaulted under this Contract.

4.      NOTICE:  Florida state law requires the following statement be disclosed to purchasers of residential homes:

THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO TEN PERCENT [10%] OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER.

[Purchaser's Initials]

WAIVER:

Purchaser waives Purchaser's rights under Section 501.1375, Florida Statutes, to have all Deposit funds (up to 10% of the Total Purchase Price) deposited in an escrow account.

NON-WAIVER:

_____ Purchaser elects to require that all Deposit funds (up to 10% of the Total Purchase Price) be deposited in an escrow account. All withdrawals from the account shall require the signatures of both Seller or Seller's affiliate and Purchaser or Purchaser's agent, except as provided below. WCI Realty, Inc., a Florida corporation, having mailing address at 24301 Walden Center Drive, Bonita Springs, Florida 34134, shall act as escrow agent (the "Escrow Agent"). In the event Purchaser elects to require that all Deposit funds (up to 10% of the Total Purchase Price) be deposited in an escrow account, Seller shall be entitled to any interest accrued on the funds deposited in the escrow account and the interest, if any, which is payable at Closing. Purchaser is hereby notified that Seller may elect to use escrowed funds for building purposes and, in such event, Seller shall acquire a surety bond issued by a company licensed to do business in Florida if such a bond is readily available in the open market, payable to Purchaser in the amount of the escrow deposit. The funds in escrow shall thereafter be released to Seller for construction purposes only. In the case where no surety bond is readily available, Seller may borrow money in an amount equal to the funds held in escrow for construction purposes only, in which case, any interest which Seller pays on such a loan for a period not to exceed 12 months shall be paid by Purchaser at the time of Closing, but Purchaser shall be credited for any interest accrued on the escrow account, or at Seller's option, Purchaser shall pay that portion of Seller's Master Surety Bond premium allocable to Purchaser's escrow deposit.

If Purchaser properly terminates this Contract pursuant to its terms, the funds shall be paid to Purchaser. If Purchaser defaults in the performance of Purchaser's obligations under this Contract and Seller is not in default, Seller may withdraw any funds being held in escrow pursuant to this Contract with any interest earned thereon, if any. In order to make such withdrawal, Seller shall send written notice by certified mail to Purchaser of Seller's intention to make such withdrawals at least 72 hours prior to the intended time of withdrawal. Upon the expiration of such 72 hour period, Seller, upon presentation to the Escrow Agent of a withdrawal slip and the passbook, if any, together with an affidavit certifying that Purchaser is in default and that Seller is not in default, may withdraw the escrowed funds. The Escrow Agent, upon receipt of such withdrawal slip and affidavit, shall release the escrowed funds to Seller. The Escrow Agent shall not be liable for the release of funds pursuant to this Section 4. If the funds of Purchaser have not been previously disbursed in accordance with this Section 4, they shall be disbursed to Seller at Closing.

5.    USE OF COMPANIES AFFILIATED WITH SELLER.

5.1.    Election. Purchaser has the right to use an attorney, a title company, and a lender chosen by Purchaser in connection with the purchase of the Residence. If the Purchaser elects to use First Fidelity Title, Inc. ("First Fidelity"), a Florida title insurance agency affiliated with Seller, in connection with this transaction, Seller will pay for the title search fee, fifty percent (50%) of the settlement fee and will and provide a $250.00 credit towards the title insurance premium to be paid by the Purchaser at Closing. To elect First Fidelity, Purchaser must check the appropriate box and initial the appropriate space immediately below. By checking the box and initialing the space immediately below, Purchaser also acknowledges receipt of the Affiliated Business Disclosure, attached hereto as Exhibit 2 and incorporated herein by this reference.

☐    Purchaser intends to use First Fidelity
                                                        Purchaser's Initials _____

5.2 Results of Election.    If Purchaser elects to use First Fidelity, Seller shall deliver to Purchaser or Purchaser's agent a title insurance commitment underwritten through First Fidelity either ten (10) days prior to Closing, or at Closing, if Closing takes place within ten (10) days of the execution of this Contract. If Purchaser does not elect to use First Fidelity, (a) Purchaser shall be responsible for obtaining a title insurance commitment and delivering a copy of such commitment to Seller either ten (10) days prior to Closing, or at Closing, if Closing takes place within ten (10) days of the execution of this Contract, and (b) Seller shall pay for those title-related expenses traditionally borne by a seller in the county in which the Residence is located (i.e., the title search fee and fifty percent (50%) of the settlement fee). Further, in the event Purchaser elects to use an attorney or a title company chosen by Purchaser in connection with the purchase of the Residence other than First Fidelity, Seller shall have no duty or obligation and is hereby released from any and all such duty and/or obligation, if any, to provide to such attorney or title company any document(s) whatsoever, including, but not limited to, any documentation regarding Seller's formation, existence and/or good standing, Seller's authority to convey the Residence or the authority of any person acting on Seller's behalf to execute and/or deliver documents on Seller's behalf.

5.3 If Purchaser has checked the box and initialed the space electing to use First Fidelity and Purchaser notifies Seller less than thirty (30) days prior to the Closing that Purchaser elects to have an owner's title insurance commitment and policy provided by an attorney or a title insurance agency other than First Fidelity, Purchaser shall pay to First Fidelity as agreed upon liquidated damages/cancellation fee an amount equal to FIVE HUNDRED and No/100 DOLLARS ($500.00) in consideration of administrative expenses incurred by First Fidelity in connection with the preparation of the title insurance commitment. Purchaser shall also indemnify and hold First Fidelity harmless from and against any and all liabilities, claims, costs, losses and damages incurred by First Fidelity in connection with the issuance of the title insurance commitment by First Fidelity, which indemnification shall survive the Closing of the transaction contemplated herein.

6.      NO LIEN RIGHTS. This Contract and any Deposits made hereunder will not give Purchaser any lien or claim against the Residence, and Purchaser's rights hereunder shall at all times, from the date hereof, be subordinate to those of any lender holding a mortgage, whether or not such mortgage secures the advancement of construction funds and even if such mortgage is placed of record and encumbers the Residence after the date of this Contract.

7.      CONSTRUCTION.

        7.1.    Completion Date. Seller is required to complete and does agree that construction of the Residence will be completed within a period of two (2) years from the date Purchaser signs this Contract. However, the date for completion may be extended by reason of delays incurred by circumstances beyond Seller's control, such as acts of God, or any other grounds cognizable in Florida contract law as impossibility or frustration of performance. It is the intention of the parties that this sale qualify for the exemption provided by 15 U.S.C. Section 1702(a)(2), and that nothing contained in this Contract shall be construed or so operate as to any obligations of Seller or rights of Purchaser in a manner which would render said exemption inapplicable.

        7.2     Initial Options and Permit Related Options. It is understood that Purchaser has the right to make such color, material, appliance, or other selections, as are permitted by Seller. Such selections shall be made by means of the two (2) documents referred to as the "Permit-Related Options Addendum" and the "Initial Options Addendum". The Permit-Related Options Addendum (by way of example but not limitation, Permit-Related Options are structural in nature and must be submitted with the initial plans and specifications to be approved by the local building department in order to commence construction of the Residence) must be completed and executed at the same time that this Contract is executed by Purchaser. The Permit Related Options Addendum must be completed and executed within the later of (i) ten (10) days following the Effective Date, or (ii) ten (10) days after receipt of written notice to Purchaser that selections are available. The selections made by use of the Permit-Related Options Addendum are final and not subject to change by Purchaser. The Initial Options Addendum must be completed and executed within the later of (i) thirty (30) days following the Effective Date, or (ii) thirty (30) days after receipt of written notice to Purchaser that selections are available. Purchaser agrees to pay a non-refundable deposit in an amount equal to twenty percent (20%) of the total cost for the options listed on the Initial Options Addendum, and the Permit-Related Options Addendum at the time Purchaser makes its selections, and further agrees to pay the balance of the cost for such options at Closing. Purchaser acknowledges and understands that Seller does not allow any changes, additions, or deletions to the Residence other than those options offered through the WCI Design Studio. If Purchaser fails to complete and execute the Initial Options Addendum and/or the Permit-Related Options Addendum during the times provided herein, Purchaser understands that all choices will be made by Seller, and Purchaser will have no right to object to those choices. If Purchaser does make any selections pursuant to this Section 7.2, Seller will use diligent efforts to provide Purchaser with Purchaser's selections, but Seller will not be liable for any substitutions Seller makes pursuant to Section 7.4 below. If the Residence is completed or partially completed, Purchaser accepts all selections which previously have been made by Seller.

                Notwithstanding the foregoing, if Seller is unable to furnish Purchaser with a complete Permit-Related Options Addendum at the time Purchaser executes this Contract, Purchaser understands and agrees that Seller shall provide written notification that Permit-Related Options are available for selection by Purchaser within ten (10) days Purchaser's receipt of such notice. Purchaser shall meet with Seller to make selections and enter into the Permit-Related Option Addendum. If Purchaser fails to make said selections, Seller shall have the right but not the obligation to make the selections for Purchaser and/or pursue all remedies set forth in the preceding paragraph.

        7.3.    General Construction Specifications. The materials, equipment and fixtures included in and to be used in constructing the Residence will be substantially the same as or similar in quality to those described in the applicable plans and specifications and in the model (except as to extras, options and/or upgrades), if a model has been constructed. Seller has the reasonable right to make modifications to the plans and specifications. Purchaser understands and agrees that models or illustrations may include up-grades and other items not included in the purchase of the Residence and agrees that the Residence will only include those items and matters specified on the applicable plans and specifications for the Residence and included on the list of standard features for the Model Type attached hereto as Exhibit 1 and incorporated herein by this reference.

        7.4.    Variations. Construction of the Residence shall be substantially in accordance with the applicable Model Type as described in Section 1 above, unless otherwise modified and in such case then in accordance with plans and specifications therefor which are filed with, and available for review at, the local building/development office of the applicable governmental authorities during normal business hours. Notwithstanding the foregoing, Purchaser further understands and agrees that Seller may substitute materials and that Seller may make changes in the plans and specifications for the Residence (a) as Seller may deem reasonably appropriate or as may be necessitated by material availability or construction requirements in the field, at any time prior to the substantial completion of the Residence, so long as the modification or change does not create a substantial adverse change from the plans and specifications for the Model Type as described in Section 1 above or plans and specifications related to approved

modifications, which are filed with, and available for review at, the local building/development office of the applicable governmental authorities during normal business hours or (b) if the modifications or changes are required by any controlling government authority. Seller agrees that such changes shall not substantially deviate from the original plans and specifications. Substituted materials shall be of equal or better quality. Purchaser further acknowledges and agrees that, because of conditions that may be encountered in construction of the Residence, the plans and specifications which are kept by Seller may not be totally consistent with those plans and specifications which are on file with various governmental authorities, and Purchaser agrees that construction of the Residence need not be accomplished totally in accordance with the plans and specifications on file with such governmental authorities. Seller will build the Residence in a workmanlike manner. Purchaser understands and agrees that certain items such as brick, wood, woodgrain, carpeting, paint, cabinets, cultured marble, tile, mica, and the like are subject to shading and gradation and may vary from samples, models or color charts, and from piece to piece and Seller will not be liable for such variation. Seller will have absolute discretion in selecting the "finishing details," including, but not limited to, the exterior of the Residence, landscaping, amenities, and beautification of the Homesite. Further, Purchaser acknowledges that trees may be harmed during the construction and development process and that Seller does not guarantee the location, replacement or survival of any trees or landscaping.

7.5.  **Interference with Construction.** Purchaser acknowledges and agrees that for reasons of safety and to comply with liability and insurance requirements imposed upon Seller, neither Purchaser nor any agent of Purchaser (including decorators and contractors) shall, until after Closing, be permitted to enter upon the Homesite and/or the Residence without Seller's prior written approval. Purchaser agrees not to interfere with or interrupt any workmen at the Residence. Purchaser covenants and agrees that Seller will not be liable for any injury resulting from Purchaser's breach of this Section 7.5 and Purchaser agrees to hold Seller harmless therefrom, which covenant and agreement shall survive this Contract and the Closing.

7.6.  **Completion.** Purchaser may not take possession of, nor make improvements to the Homesite or Residence until after Closing and payment to Seller of all sums due to Seller hereunder. The issuance of the certificate of occupancy for the Residence by the appropriate governmental authority shall constitute conclusive and indisputable proof that (a) the Residence was constructed in compliance with applicable building codes, (b) Seller has substantially performed Seller's obligations under this Contract and (c) that construction has been substantially completed ("Completion of Construction"). It is specifically agreed between the parties to this Contract that any "punch list" or "touch up items" required to be completed by Seller will not constitute grounds for delaying acceptance of possession nor for withholding or escrowing any of the funds due to Seller hereunder.

8.  **CONVEYANCE AND TITLE ISSUES.**

8.1.  **Deed.** Seller shall convey fee simple title to the Residence to Purchaser at Closing by delivery to Purchaser of a Special Warranty Deed (the "Deed"). Title to the Residence will be good, marketable and insurable, subject only to the following approved title exceptions: (a) real property ad valorem taxes for the year of closing; (b) zoning, building code and other use restrictions imposed by governmental authority; (c) outstanding canal, road right-of-way, oil, gas and mineral interest of record, if any; and (d) restrictions and easements common to the subdivision, provided, however that no one of them shall prevent use of the property for residential purposes (the "Permitted Exceptions"). Any such matters omitted from the Deed shall nevertheless be deemed to be included in the Deed. This Section shall survive the Closing and delivery of the Deed. The acceptance of the Deed by Purchaser shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to this Contract, except those which are herein specifically deemed to survive Closing or which may survive by operation of law (if any).

8.1.1  Sixty (60) days prior to Closing, Purchaser shall advise Seller of (a) the manner in which title will be taken, (b) whether Purchaser wishes to close in person or by mail, and (c) the name, address and telephone number of the attorney who will represent Purchaser in the Closing

8.2.  **Examining Commitment.** Purchaser or Purchaser's agent shall have five (5) days from the date of receiving the title insurance commitment from First Fidelity or such other title company selected by Purchaser, to examine the same and notify Seller of any objections to matters of title, other than the Permitted Exceptions referenced in Section 8.1 above and matters to be satisfied at Closing. If Purchaser does not object to such other matters shown on the title insurance commitment within such five (5) day period, then such other matters shall also automatically be considered to be included within the Permitted Exceptions. Seller shall have ninety (90) days after receiving Purchaser's written notice of any objections to title to correct any defects in title if Seller agrees that such defects render title unmarketable, but Seller is not obligated to do so and Closing shall be automatically extended for such ninety (90) day period to permit Seller to correct any such obligations to title. If Seller cannot or elects not to correct the title defects, Purchaser shall have the option of either (a) accepting title in the condition offered (with defects), paying the Total Purchase Price (without set off or deduction therefor) for the Residence and waiving in writing at Closing any claims against Seller because of such defects, or (b) canceling this Contract and receiving a full refund of the Deposit and any and all deposits for options, extras and/or upgrades, whereupon Seller and Purchaser shall be relieved of all liability and obligations under this Contract.

9.  **CLOSING AND POSSESSION DATES.**

9.1.  **Closing.** Without limiting Seller's obligation under Section 7.1 hereof to complete construction of the Residence within a period of two (2) years from the date Purchaser signs this Contract, Purchaser acknowledges and agrees that Seller has the right to schedule the date, time and place of the closing of this transaction (the "Closing") and that Purchaser shall close on such date, time and place scheduled by Seller (the "Closing Date"). Purchaser will be given at least fourteen (14) days' notice of the Closing Date, time and place in accordance with the

provisions of Section 23 hereof. In the event the Closing Date, time or place set forth in the fourteen (14) day notice must be changed, Seller shall give Purchaser forty-eight (48) hour notification of such change. At Closing, Purchaser will execute any documents required to effectuate the consummation of the transactions contemplated by this Contract and the release of all funds, if any, which Seller is holding in escrow relative to this Contract.. At Closing, Purchaser agrees to pay to Seller the balance of the Total Purchase Price and any additional amounts Purchaser owes under this Contract by cashier's check or by federal wire transfer.

9.2.    Closing by Mail. Purchaser may close the transaction contemplated herein by mail on the date required by Seller's notice. In such event, Purchaser will pay for Seller's costs of mailing or sending the Closing documents to Purchaser. Within two (2) working days after Purchaser receives such Closing documents, Purchaser will send back to Seller by overnight professional courier, the remittances, executions, acknowledgments, and other necessary responses as required by Seller in order to effectuate the Closing. Otherwise, Purchaser will be obligated to appear at the time, place and date set by Seller.

9.3.    Possession Date. Seller will deliver possession of the Residence to Purchaser at Closing.

9.4.    Third Parties. Relative to the Closing and Closing documents, Seller shall have no obligation to any third parties (i.e., lenders or title insurance providers) and shall be under no obligation to deal with any person or firm other than Purchaser and Purchaser's attorney.

9.5.    Closing Documents. At Closing, Seller shall provide Purchaser with (a) an Owner's "GAP" Affidavit, and Tax Proration Affidavit and Affidavit Under Section 1445 IRC, and (b) the Deed.

10.    CLOSING COSTS. All prorations and charges will be made as of the Closing Date, except that if the Closing Date is delayed at Seller's request, the prorations and charges will be made as of the delayed Closing Date. Purchaser understands and agrees that in addition to the balance of the Total Purchase Price, Purchaser shall pay, at the Closing, certain other fees and costs described in the Real Property Sales Disclosure attached hereto as **Exhibit 5** and incorporated herein by this reference.

11.    DEFAULT.

11.1.    Purchaser's Default. If Purchaser fails to perform this Contract within the time specified (including all payments required hereunder), then Purchaser shall lose any and all rights under this Contract and all deposits and monies paid by Purchaser hereunder may be retained by or for the account of Seller as agreed upon liquidated damages, consideration for the execution of this Contract and in full settlement of any claims; whereupon Purchaser and Seller shall be relieved of all obligations under this Contract. The parties agree that this provision is not intended as a penalty or a forfeiture and that Seller's actual damages in the event of Default by Purchaser would be extremely difficult or impossible to determine. Therefore, by signing this Contract, the parties acknowledge that the amount(s) paid or agreed to be paid by Purchaser as of the date of such default, with interest accrued thereon, if applicable, is agreed upon, after negotiation, as the parties' reasonable estimate of Seller's liquidated damages in the event of a breach of this Contract by Purchaser.

11.2.    Seller's Default. If Seller defaults in the performance of this Contract, nothing contained herein shall be deemed to restrict the Purchaser's remedies, if the Purchaser shall be entitled to such remedies under applicable law, including the right to seek specific performance.

12.    ON-SITE PERSONAL INSPECTION. Purchaser acknowledges that Purchaser has personally made an on-site inspection of the Homesite prior to the execution of this Contract by Purchaser and that the On-Site Personal Inspection Addendum attached hereto as **Exhibit 6** and incorporated herein by this reference shall be executed by Purchaser in conjunction with the execution of this Contract.

13.    RESIDENCE INSPECTION PROCEDURE.

13.1.    Personal Inspection. Prior to Closing, Seller shall arrange a time for Purchaser to personally inspect the Residence with Seller's representative. If Purchaser is unable to conduct the personal inspection of the Residence with Seller, Purchaser may designate a representative by written notice to Seller. Purchaser will be bound by any action or failure to act by the representative.

13.2.    List of Inspection Items. During the personal inspection, Purchaser or Purchaser's representative and Seller shall complete a list noting all items, if any, in the Residence which require Seller's attention. Purchaser and Seller will sign the list as conclusive evidence of the agreed upon work to be performed by Seller. The agreed upon work will be performed within a reasonable time considering the availability of materials and the nature of the work to be performed. Once Seller has corrected all of the items on the list it shall be deemed that (a) Seller's obligations relative to performing the agreed upon work have been satisfied in full, and (b) any items not noted on the list of agreed upon work to be performed by Seller will be the responsibility of Purchaser.

13.3.    Failure to Conduct Inspection. If Purchaser fails to take advantage of the personal inspection scheduled by Seller, Purchaser shall be deemed to have (a) accepted the Residence "AS-IS," and (b) waived the right to submit a list of items for Seller to agree to perform. Notwithstanding the occurrence of the foregoing, any warranties provided to Purchaser by Florida law shall remain in effect. Neither Purchaser's failure to complete the personal inspection described in Section 13.1 above, nor Seller's failure to complete work on all of the items, if any, described on the list of items to be addressed by Seller, will entitle Purchaser to (I) defer the Closing, (II) request a set off, (III) impose any condition on Seller at Closing, or (IV) delay payment of money due Seller in accordance

with this Contract. Purchaser's refusal to accept delivery of possession as scheduled will constitute a default by Purchaser. Seller's obligation to perform the work agreed upon will survive the Closing.

14.     LIMITED WARRANTY.  NO WARRANTIES OR REPRESENTATIONS, OTHER THAN THOSE SPECIFIED IN THIS CONTRACT, ARE EXPRESSED OR IMPLIED.  The Limited Warranty pertaining to the Residence is attached hereto as Exhibit 7 and incorporated herein by reference. Notwithstanding any term or provision contained herein or in Exhibit 7 to the contrary, such Limited Warranty pertaining to the Residence runs in favor of the Purchaser only and is not transferable.  Any obligations under this Limited Warranty terminate automatically if the Residence is sold, leased, transferred or conveyed by operation of law or action of Purchaser, voluntarily or involuntarily. The terms of this Section 14 will survive the Closing.

15.     FOUNDATION.  Because the Homesite is located in a community governed by a homeowners' association known as Parkland Golf & Country Club Foundation, Inc., a Florida not-for-profit corporation ("Foundation"), the provisions of Section 698.26, Florida Statutes, require that, before Purchaser signs this Contract, Seller provide Purchaser the Foundation Disclosure Summary, a copy of which is attached hereto as Exhibit 8 and incorporated herein by reference. Purchaser understands and accepts the responsibility to pay all Foundation assessments levied against the Homesite.

16.     COOPERATING BROKER.  Unless a Cooperating Broker Addendum indicating otherwise is attached hereto, Purchaser represents to Seller that Purchaser has not consulted, dealt or negotiated with a real estate broker, salesperson or agent other than Seller's sales personnel.  Purchaser agrees that Seller is not responsible for the payment of a commission to a real estate broker, salesperson or agent other than Seller's sales personnel and Purchaser agrees to indemnify and hold Seller harmless from and against any and all loss and liability, including attorneys' and paraprofessional's fees and costs at all levels, resulting from or arising out of any representation or warranty set forth in this Section 16. Purchaser understands and agrees that this Section 16 shall survive the Closing and the delivery of the Deed.

17.     PROMOTIONAL USE OF RESIDENCE.  Purchaser agrees to allow Seller, and/or its agents, to photograph and/or produce any other forms of visual representations of the exterior of the Residence and to use said photographs and other exterior visual representations in any promotion or publicity materials that Seller and/or its agents may require for the Community.  Seller agrees at all times to use the photographs and other visual representations and any accompanying publicity materials in a manner that is in keeping with the overall high values proposed for the Community.  Upon request of Seller, Purchaser agrees to sign a release holding Seller harmless from all claims arising from Seller's use of the photographs, publicity materials and other visual representations. This Section 17 shall survive the Closing and the delivery of the Deed.

        17.1    Seller's Use of the Community.  As long as Seller and/or the Declarant/Developer under the "Declaration," as such term is defined in Exhibit 8 hereof, owns any portion of the Community, Seller and/or the Declarant/Developer may maintain sales and leasing offices and models within the Community to assist Seller in selling, reselling and leasing properties in the Community and properties located outside of the Community.  As long as Seller and/or the Declarant/Developer, owns any land or Residence in the Community, Seller and/or the Declarant/Developer shall have the right and privilege to maintain general sales offices in and about the Community, including model residences, and to have their employees present on the premises to show homes, use Community facilities and/or property and, without limitation, to do any and all other things necessary or appropriate by them to sell, resell, or lease homes and other properties owned by Seller, all without charge or contribution; provided, however, that such activities shall be carried on in such a manner as will not unreasonably interfere with Purchaser's enjoyment of the Residence.

18.     SELLER'S RIGHT TO RE-PLAT, RE-SUBDIVIDE, RE-CONFIGURE SITES.  Seller reserves all rights to amend the plan of development, re-plat, re-subdivide and re-configure the Community as set forth in the Parkland Golf & Country Club Declaration as the same may be amended from time to time, applicable to the Community (the "Declaration"). The provisions of this Section 18 shall survive the Closing and delivery of the Deed.

19.     INSULATION DISCLOSURE.  Pursuant to Section 460.146 of the United States Code of Federal Regulations, the Insulation Disclosure Addendum is attached hereto as Exhibit 9 and is incorporated herein by reference.

20.     RADON GAS.

        A.      The following disclosure is required by Section 404.056, Florida Statutes: RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

        B.      After Closing, Purchaser, at Purchaser's expense, may test the home for the presence of radon. The test must be completed within thirty (30) days of Closing. The testing must be performed by a radon measurement business/individual properly certified to perform such work in accordance with all State and Federal regulations.  A complete copy of the test results and any accompanying report must be furnished to Seller in writing by certified mail within five (5) working days of Purchaser's receipt of the test results.

        If the results of Purchaser's test indicates the presence of radon at a level greater than 4.0 picoCuries/liter (pCi/l; equivalent to 0.02 Working Levels), Seller may, at its option, perform additional testing of the home for the

presence of radon and Purchaser agrees to reasonably cooperate with Seller in order to accomplish such testing. Such testing will be conducted by a radon measurement business/individual of Seller's choice and properly certified to perform such work in accordance with all State and Federal regulations. The results of such tests will be furnished to Purchaser.

If Seller's test indicates the presence of radon in excess of 4.0 pCi/l, or if Purchaser's test indicates the presence of radon in excess of 4.0 pCi/l and Seller has not elected to perform additional testing, then Seller shall take such corrective action as Seller may deem appropriate in order to reduce the presence of radon in the home to or below 4.0 pCi/l.

Purchaser expressly acknowledges and agrees that the above represents Seller's sole and exclusive obligation with regard to the presence of radon in the home. Purchaser, on behalf of themselves, each other and on behalf of each Purchaser's child or ward (all collectively hereinafter referred to as "Releasors"), hereby fully release, remise and forever discharge Seller, agent for Seller, as well as the employees, agents, servants, attorneys, executors, administrators, insurers, any parent company, subsidiaries, affiliates, or related entities, as well as the representatives, successors, and assigns of either Seller or agent (all collectively hereinafter referred to as "Releasees") of and from any and all obligations, claims, debts, demands, covenants, contracts, promises, agreements, warranties (both express and implied), torts, statutory violations, liabilities, controversies, costs, expenses, attorney's fees, actions or causes of action of any nature whatsoever, at law or in equity, whether foreseen or unforeseen, matured or unmatured, known or unknown, accrued or not accrued, direct or indirect, which Releasors ever had, now have or can, shall or may hereafter have, against Releasees, or any of them, either alone or in combination with any of themselves, or others, arising out the presence of radon in the home or any building on the premises.

21.     SWIMMING POOL.  If a swimming pool is included in the Residence, Purchaser acknowledges the receipt of the Department of Health drowning prevention and pool ownership public information publication in accordance with the Preston de Ibern/McKenzie Merriam Residential Swimming Pool Safety Act, being Chapter 515, Florida Statutes (the "Pool Safety Act"), and attached hereto as **Exhibit 12**. Furthermore, the Pool Safety Act requires that all residential swimming pools meet at least one of the pool safety features specified therein. Violations of the Pool Safety Act may be prosecuted.

22.     ENERGY EFFICIENCY RATING DISCLOSURE.  Pursuant to Section 553.996, Florida Statutes, Purchaser may request that Seller cause a State Certified Energy Rater to perform an energy efficiency rating on the Residence. Purchaser hereby releases Seller from any responsibility or liability for the accuracy or level of rating and Purchaser understands and agrees that this Contract is not contingent upon Purchaser approving the rating, that the rating is solely for Purchaser's own information and that Purchaser will pay the total cost of obtaining the rating. A copy of the Florida Building Energy-Efficiency Rating System brochure prepared by the Florida Department of Community Affairs in accordance with Section 553.996, Florida Statutes, is attached hereto as **Exhibit "10"** and incorporated herein by this reference.  PURCHASER ACKNOWLEDGES RECEIPT OF THE ENERGY-EFFICIENCY RATING BROCHURE DISTRIBUTED BY THE STATE OF FLORIDA DEPARTMENT OF COMMUNITY AFFAIRS AND STATES THAT PURCHASER WAIVES THE OPPORTUNITY TO OBTAIN AN ENERGY-EFFICIENCY RATING ON THE UNIT. Seller is providing this disclosure statement to Purchaser in compliance with Sections 553.9085 and 553.996, Florida Statutes. This Disclosure Statement is intended for the sole and exclusive use of Purchaser for the transaction contemplated herein only and Seller shall not be liable or responsible to any third party who has relied upon the information contained herein. Purchaser acknowledges its receipt, review and understanding of this disclosure statement prior to, or at the time of, Purchaser's execution of this Contract.

23.     NOTICE.  Any notice of Closing, or any postponement thereof, may be given verbally, by telephone, telegraph, telex, telecopier, mail or other means of communication at Seller's option. An affidavit of one of Seller's representatives that such notice was given will be conclusive for purposes of proving that notice was given. Except as otherwise provided herein with respect to notices of the scheduled date of the Closing, any notice, demand, consent, delivery or request which is required or permitted to be given in connection with this Contract shall be in writing and sent by United States certified mail with return receipt requested, professional courier or telecopier (with confirmation and copy by (a) certified mail if Purchaser's address is within the United States or (b) overnight professional courier if to a Purchaser whose address is outside of the United States) to Purchaser or Seller at the addresses set forth on the first page hereof. All notices shall only be effective upon receipt or refusal to accept receipt (by failure to accept delivery or otherwise). All notices will be given to Purchaser at the address or by use of the telephone numbers(s) specified on the first page hereof unless Seller has received written notice from Purchaser of any change therein prior to the date notice of Closing is given.

24.     TIME OF ESSENCE.  Purchaser acknowledges that time is of the essence in connection with Purchaser's obligations under this Contract.

25.     CONTRACT NOT TO BE RECORDED.  Purchaser covenants that Purchaser shall not record this Contract or any memorandum hereof in the Public Records of any County in the State of Florida.  Purchaser agrees, if Purchaser does record this Contract in any such Public Records, to pay all of Seller's legal fees and expenses, and paraprofessional fees and expenses incurred in removing the exception to title caused by such recordation. Seller's rights under this _Section 25_ shall be in addition to Seller's remedies for Purchaser's default provided in _Section 11_ hereof.

26.     GOVERNING LAW.  Any disputes that develop under this Contract and/or any amendment and/or addendum hereto will be settled according to Florida law, without application of conflict of law principals.

27.    ATTORNEYS' FEES AND COSTS.  In connection with any litigation, including appellate proceedings, arising out of this Contract, the prevailing party shall be entitled to recover reasonable attorneys' fees, paraprofessionals' fees and costs.

28.    VENUE.  Purchaser and Seller agree that the venue for resolution of any dispute regarding this Contract lies within the County wherein the Residence is located.

29.    COUNTERPARTS AND TELECOPIED SIGNATURES.  This Contract shall be validly executed when signed in counterparts.  Signatures may be given via facsimile transmission and shall be deemed given as of the date and time of the transmission of this Contract by facsimile to the other party.

30.    SECTION HEADINGS.  The section headings in this Contract are for convenience only and shall not affect the meaning, interpretation or scope of the provisions which follow them.

31.    INTERPRETATION.  The use of the masculine gender herein shall be deemed to refer to the feminine or neuter gender, and the singular shall include the plural, and vice versa, whenever the context so requires.

32.    ENTIRE CONTRACT.  Purchaser certifies that Purchaser has read every provision of this Contract and each addendum/exhibit incorporated herein by reference and that this Contract, together with all such addenda/exhibits, constitutes the entire agreement between Purchaser and Seller.  This Contract is the entire agreement for the sale and purchase of the Residence and, once signed, this Contract can only be amended by a writing signed by both parties hereto.  Prior agreements, representations, understandings and oral statements not reflected in this Contract have no effect and are not binding on Seller.

33.    ORAL PREPRESENTATIONS.  NO PERSON, INCLUDING ANY SALES AGENT OF SELLER OR ANY OTHER REAL ESTATE BROKERAGE FIRM, IS AUTHORIZED TO MAKE ANY REPRESENTATIONS OR TO PROVIDE ANY INFORMATION CONTRARY TO OR IN ADDITION TO THE INFORMATION CONTAINED IN THIS CONTRACT OR IN THE APPLICABLE OR RELATED COMMUNITY COVENANTS OR RULES, AS AMENDED.  PURCHASER ACKNOWLEDGES THAT NO SUCH REPRESENTATIONS HAVE BEEN MADE TO (OR, IF MADE, HAVE NOT BEEN RELIED UPON BY) PURCHASER BY ANY PERSON OR ENTITY.

34.    RISK OF LOSS PRIOR TO CLOSING.  If between the Effective Date and the Closing, the Residence is damaged by fire, natural disaster or other casualty, the following shall apply:

34.1.    Risk of loss to the Residence by fire, natural disaster or other casualty until the Closing is assumed by Seller, but without any obligation of Seller to repair or replace the Residence, except that if Seller elects to repair or replace such loss or damage to the Residence, this Contract shall continue in full force and effect and Purchaser shall not have the right to reject title or receive a credit against or abatement in the Total Purchase Price.  If Seller elects to repair or replace such loss or damage, Seller shall be entitled to a reasonable period of time within which to complete such repairs or replacement.  Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss or damage shall belong entirely to Seller.  If such proceeds shall be paid to Purchaser, Purchaser agrees that such funds are the property of Seller and Purchaser shall promptly upon receipt thereof turn the same over to Seller.  If Seller notifies Purchaser that Seller does not elect to repair or replace any such loss or damage to the Residence, then this Contract shall be deemed canceled and of no further force or effect.  In such case, Seller shall refund to Purchaser all monies deposited under this Contract, whereupon the parties shall be released and discharged of all claims and obligations under this Contract (except those obligations of Purchaser which are to survive the termination of this Contract), except that if Purchaser is then otherwise in default hereunder, Seller shall retain all deposits and monies paid hereunder as and for liquidated damages as provided in Section 11 hereof.

34.2    Risk of loss to the Residence by fire, natural disaster or other casualty from and after Closing is assumed by Purchaser.  Purchaser should be aware that the Residence, however well constructed, may be subject to damage or destruction by naturally occurring events, such as hurricanes and sinkholes.  While Seller has no knowledge of sinkholes or naturally occurring gases, such as radon, in the immediate vicinity of the Residence, all risks associated with all natural occurrences shall be borne by Purchaser from and after Closing.

35.    TRANSFER OR ASSIGNMENT.  Purchaser has no right to assign, sell or transfer Purchaser's interest in this Contract (whether voluntarily or by operation of law or otherwise) without Seller's prior written consent.  If Purchaser is a corporation, other business entity, trustee or nominee, a transfer of any material equity or beneficial interest shall constitute an assignment of this Contract.  If Purchaser attempts to assign this Contract in violation of this Section 35, Seller can declare Purchaser in default and Seller shall be entitled to all remedies available under Section 11 hereof.  Purchaser agrees that Seller may withhold its consent with or without any reason or condition in any manner it chooses (if it gives it at all) and may charge Purchaser a reasonable amount to cover administrative costs incurred in considering whether or not to grant consent.  Seller may assign or transfer Seller's interest in this Contract without Purchaser's consent.  If the assignee or transferee assumes Seller's obligations contained in this Contract, Seller will not be liable to Purchaser for any acts, omissions or defaults of the assignee or transferee and Seller shall have no further obligations under this Contract.

36.    PERSONS BOUND BY THIS CONTRACT.  If Purchaser dies or in any way loses legal control of Purchaser's affairs, this Contract will bind Purchaser's heirs and legal representatives.  If Purchaser has received

Seller's written consent to assign or transfer this Contract, then Purchaser's approved assignees shall be bound by the terms hereof. If more than one person signs this Contract as Purchaser, each such person shall be jointly and severally liable for the full performance of all of Purchaser's duties and obligations hereunder.

37.   ATTACHMENTS. Attached hereto and incorporated herein by this reference are the following described Exhibits and items:

Exhibit 1-A Platting Rider and Site Plan (If applicable)
Exhibit 1-B Model Type Features
Exhibit 2 Affiliated Business Disclosure
Exhibit 3 Intentionally Deleted
Exhibit 4 Intentionally Deleted
Exhibit 5 Real Property Sales Disclosure Statement
Exhibit 6 On-site Inspection Addendum
Exhibit 7 Limited Warranty
Exhibit 8 Foundation Disclosure Summary including
   First Fidelity, NSID Fees and Assessments
Exhibit 9 Insulation Disclosure

Exhibit 10 Florida Building Energy-
Efficiency Rating System Brochure
prepared by the Florida Department
of Community Affairs
Exhibit 11 Privacy Disclosure Statement
Exhibit 12 Pool Safety Act
Exhibit 13 Good Faith Estimate for
Maintaining Streets
Exhibit 14 Cooperating Broker Addendum
Exhibit 15 Statement by Purchaser
Concerning  Use  of  Future  Golf
Facilities
Exhibit 16 Acknowledgement Regarding
Availability of Membership Project
Documents
Exhibit 17 Receipt of Documents

Other items, exhibits or addenda: _Completion____ _____ _____

All references to this Contract shall be deemed to refer to each of the Exhibits and attachments referred to above.

**PURCHASER SHOULD NOT EXECUTE THIS CONTRACT UNTIL PURCHASER HAS RECEIVED AND READ THE DISCLOSURES ATTACHED HERETO AS EXHIBITS 2, 5, 6, 8, 9, 10, 11, 12, and 13 AND INCORPORATED HEREIN BY THIS REFERENCE. BY PURCHASER'S EXECUTION OF THIS CONTRACT, PURCHASER AGREES, COVENANTS, REPRESENTS AND WARRANTS THAT PURCHASER HAS RECEIVED AND READ THE DISCLOSURES ATTACHED HERETO AS EXHIBITS 2, 5, 6, 8, 9, 10, 11, 12 and 13 PRIOR TO EXECUTING THIS CONTRACT.**

38.   RESOLUTION OF DISPUTES. PURCHASER ACKNOWLEDGES THAT THIS CONTRACT IS A SOPHISTICATED LEGAL DOCUMENT. ACCORDINGLY, JUSTICE WILL BEST BE SERVED IF ISSUES REGARDING THIS CONTRACT ARE HEARD BY A JUDGE IN A COURT PROCEEDING, AND NOT A JURY. PURCHASER AGREES THAT ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION, WITH RESPECT TO ANY ACTION, PROCEEDING, CLAIM, COUNTERCLAIM, OR CROSS CLAIM, WHETHER IN CONTRACT AND/OR IN TORT (REGARDLESS IF THE TORT ACTION IS PRESENTLY RECOGNIZED OR NOT), BASED ON, ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED TO THIS CONTRACT, THE DOCUMENTS INCORPORATED HEREIN BY REFERENCE (INCLUDING, WITHOUT LIMITATION, THE DECLARATION), ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT, VALIDATION, PROTECTION, ENFORCEMENT ACTION OR OMISSION OF ANY PARTY SHALL BE HEARD BY A JUDGE IN A COURT PROCEEDING AND NOT A JURY. SELLER HEREBY SUGGESTS THAT PURCHASER CONTACT AN ATTORNEY IF SUCH PURCHASER DOES NOT UNDERSTAND THE LEGAL CONSEQUENCES OF EXECUTING THIS CONTRACT. NOTWITHSTANDING THE FOREGOING, THIS PROVISION SHALL SURVIVE CLOSING AND THE DELIVERY OF THE DEED.

39.   ESTIMATE OF COST FOR MAINTAINING STREETS. Because the Homesite is located in a community governed by a homeowners' association and may be located within a community development district, as defined in Chapter 190, Florida Statutes, which may be responsible for maintaining streets in the Community, Florida law requires that, before Purchaser signs this Contract, Seller provide Purchaser with a good faith estimate of the cost for maintaining such streets in the Good Faith Estimate of Cost for Maintaining Streets, a copy of which is attached hereto as Exhibit 13 and incorporated herein by this reference. Purchaser understands and accepts the responsibility to pay all Foundation assessments levied against the Homesite.

40.   INDUCEMENT. Purchaser acknowledges that the sole inducement to purchase the Residence is the Residence to be constructed thereon.

41.   NOT BINDING. This Contract shall not be binding on Seller until executed by an authorized agent or officer of Seller.

42.   WAIVER. Seller's waiver of any of its rights or remedies shall not operate to waive any other of Seller's rights or remedies or to prevent Seller from enforcing the waived right or remedy in another instance.

43.   SURVIVAL, INCORPORATION AND SEVERABILITY. The provisions and disclaimers in this Contract which are intended to have effect after the Closing shall survive the Closing. The explanations and disclaimers set forth in the Documents are incorporated into this Contract. In the event that any clause or provision of this

Agreement shall be void or unenforceable, such clause or provision shall be deemed deleted so that the balance of this Contract is enforceable.

44.    SALE OF OTHER RESIDENCE.  Purchaser agrees that this Contract will not be subject to or contingent upon Purchaser selling Purchaser's present residence or any other property.

45.    CONSTRUCTION INDUSTRIES RECOVERY FUND.  Pursuant to Section 489.1425, Florida Statutes, Seller provides the following notice: PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE-LICENSED CONTRACTOR.  FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS: (904) 727-6530, FCILB, 7960 Arlington Expressway, Suite 300, Jacksonville, Florida 32211-7467.

46.    INCENTIVE PROGRAMS.  At various times, Seller or its affiliates adopts incentive programs with its affiliated brokerage entity, Prudential Florida WCI Realty under which the agents of such affiliated brokerage entity receive bonuses in addition to commissions for sales of Homesites or Residences constructed by Seller or its affiliates or for sales of Residences or Homesites constructed and/or developed by Seller or its affiliates, which may include the Lot, the Residence or the Unit, as applicable.

47.    PRIVACY DISCLOSURE.  Seller has been provided the Privacy Disclosure Statement attached hereto as Exhibit "11" and included herein by this reference, and Purchaser by execution of this Contract, acknowledges receipt of such disclosure.

48.    NATURAL GAS AGREEMENT.  Purchaser acknowledges that Seller may enter into a natural gas agreement with a natural gas provider ("Company").  The terms of the natural gas agreement may provide, among other things, for Company to install natural gas distribution systems and service lines in the Community.  The natural gas agreement may further provide that the Company shall pay to Seller a gas piping allowance for each qualified lot.  Purchaser shall be obligated to comply with and install the minimum number of gas appliances as set forth in the natural gas agreement, a copy of which, if any, shall be delivered to Purchaser upon the execution of this Contract.

49.    TELECOMMUNICATIONS AGREEMENT.  Purchaser acknowledges and agrees that the Homesite may be subject to exclusive systems for the provision of telecommunications services.  Seller may establish and operate such systems itself or may enter into agreements with related or unrelated persons or entities for this purpose, with any such agreements to be on such terms as the Seller shall deem, in its sole discretion, to be in the best interests of the Community.  If Seller is not the telecommunications provider for any particularly telecommunications service, Seller shall have the right to receive, on a perpetual basis, all or a portion of access fees and/or the revenues derived from such telecommunications service within the Community as agreed, from time to time, between the telecommunications provider and Seller.  Any such systems for telecommunications services shall be mandatory for all lot owners, regardless of when they take title to a lot.

50.    CABLE AGREEMENT.  Purchaser acknowledges and agrees that the Homesite may be subject to a cable television access and service agreement ("Cable Agreement") between the Foundation and a telecommunication provider.  The telecommunication provider may have the exclusive right to deliver bulk cable services to the Community pursuant to a Cable Agreement.  Notice is hereby given that the terms of the Cable Agreement may be applicable to the Homesite, and that Purchaser may be bound by the terms of the Cable Agreement.  Further, the telecommunications provider may be obligated to pay Seller a fee for telecommunication provider's right to provide cable service to the Community pursuant to a compensation agreement between telecommunication provider and Seller.  All Homesites may be charged for basic television cable service regardless of whether the Purchaser desires such service.  The basic cable service may be billed as part of the assessments owed to the Foundation.  Pay channels and certain additional telecommunication services offered by any telecommunication provider will be available on an individual subscriber basis.

51.    PROXIMITY TO GOLF COURSE, ASSUMPTION OF RISK AND INDEMNIFICATION.  Purchaser acknowledges that the Homesite may be located adjacent or close to the Parkland Golf Club Golf Course (the "Golf Course").  Membership in the Foundation does not include membership in the Golf Course.  Purchaser is aware that owning or occupying property adjacent or close to a golf course, as in the case of the Homesite, if applicable, involves certain risks which may affect the use and enjoyment of the Homesite.  Purchaser acknowledges that such risks may include, but are not limited to, golf balls being hit into Purchaser's Homesite and/or any common areas, if any, with the potential of causing bodily injury or damage to property.  Additionally Purchaser acknowledges that herbicides, pesticides, and other chemicals may be used from time to time on the Golf Course for care and maintenance of the Golf Course.  Purchaser hereby expressly assumes such risks and agrees that neither Seller nor any entity designing, constructing, owning or managing the Golf Course will be liable to Purchaser or any invitee, tenants, licensees, guests, or family, of Purchaser claiming any loss or damage for personal injury, damage to property, trespass or any other alleged wrong attributable to any extent to the proximity of the Homesite or the any common area to the Golf Course and its operation as such.  This release of liability will apply, without limitation, to any such claim arising in whole or in part from the negligence of Seller or any other entity designing, constructing, managing or owning the Golf Course.  Purchaser agrees to indemnify and hold harmless Seller and any other entity designing, constructing, managing or owning the Golf Course against all claims by Purchaser's invitees, licensees, guests or family with respect to any claims above described.  Nothing in this Section will restrict or limit the right of Seller or any entity owning or managing the Golf Course to change the design and layout of the Golf Course, size

and elevation of buildings and trees, bunkers, fairways, greens, and water bodies, from time to time, and such changes, if any, will not nullify, restrict or impair Purchaser's covenants and obligations stated in this Section. Any such changes may diminish, obstruct or impair any view from the Homesite, and any express or implied easements for view purposes or for the passage of light or air are hereby disclaimed. Purchaser acknowledges that Purchaser's covenants contained in this Section are a material consideration to Seller in entering into this Contract and have been required by Seller as a condition of the sale of the Homesite by Seller to Purchaser. The provisions of this Section will survive closing and will inure to the benefit of Seller, its successors and assigns, and any entity designing, constructing, owning or managing the Golf Course, and their respective successors and assigns.

52.    FLOOD ZONE.  Purchaser acknowledges and understands that the Homesite may be in a flood zone. Mortgage lenders will typically require the issuance of flood insurance as a requirement for financing, which insurance must be present at Closing.   Seller recommends that each purchaser of a Homesite protect his/her Homesite by obtaining proper insurance coverage. It is possible, however, for a purchaser to submit documentation to FEMA to have the Homesite re-classified by FEMA, whereby the mortgage lender may have the option to waive the requirement of flood insurance.  Purchaser is solely responsible for the submission to FEMA for such re-classification and any and all expenses related to such submission.  Further, Purchaser acknowledges and understands that the waiver of flood insurance is at the sole discretion of the mortgage lender.

53.    WATER RESTRICTIONS.   Purchaser acknowledges and understands that in the event of drought conditions, there may be reduced water capacity and governmental agencies may determine that the water feature, water body and/or fountain use in the Community may be modified or rendered inoperative.

54.    WATERFALL FEATURES.  The Foundation shall maintain all waterfall features located in the Community. All waterfall features shall be Limited Community Property, as defined in the Declaration, and all expenses for such maintenance and water supply shall be a Community Expense, as defined in the Declaration. Such waterfall features shall use potable water supplied by the North Springs Improvement District and may be controlled by a timer at Seller's discretion. In the event of drought, the use of the waterfall features may be limited, modified or may cease as determined by any applicable governmental agencies. SELLER MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE VIEWS OF WATER FEATURES AND/OR THE SPECIAL ELEMENTS OF THE WATER FEATURES, INCLUDING BUT NOT LIMITED TO, THE LOCATIONS OF THE FOUNTAINS, WATERFALLS, ROCKS, LANDSCAPING MATERIALS, SIZE AND DIMENSIONS OF THE WATER FEATURES, OR NOISE CAUSED BY SUCH WATERFALL FEATURES.

55.    IRRIGATION SYSTEM FOR HOMESITES AND WATER FEATURES.  Purchaser acknowledges and understands  that the water utilized within the  irrigation system for the Homesite and water  features within the Community shall be potable water supplied by North Springs Improvement District  Potable water may or may not have a high concentration of iron which can cause staining. Seller cannot detect in advance or control whether the water supplied by North Springs Improvement District  may stain walls, sidewalks, driveways and surrounding areas. Purchaser further understands that it may become necessary to install a treatment system to the irrigation water to prevent staining on the Homesite, sidewalks, driveways, or other surrounding areas.  Installation of such a treatment system shall be at Purchaser's sole expense and responsibility. Each Homesite will have its own irrigation system for which Homesite owner will be responsible for the maintenance, repair and replacement thereof and each Homesite will be separately metered.  Such water shall be used only for  irrigation purposes and water features and not for drinking.

56. Pet Restrictions.  Purchaser understands that the only pets allowed on the Community are those which are in accordance with the restrictions contained in the Declaration or any amendments thereto.

57. AUDUBON INTERNATIONAL.     Seller may develop portions of the Community under the Audubon International Sustainable Development Program ("Audubon Program").  The Program requires adherence to the management principles and practices outlined by Audubon International in the Natural Resource Management Plan ("Audubon Plan") on file with the Foundation.  The Plan is a comprehensive management plan developed by Audubon International that establishes criteria and guidelines that address wildlife conservation, water conservation, waste reduction and management, energy efficiency, and environmental information and outreach in the Community. If Seller develops portions of the Community in accordance with the Program, then to retain certification in the Program, the Foundation must, among other things, comply with the Plan, file annual reports and monitoring data, maintain documentation regarding environmental conditions, host an annual audit, pay an annual re-certification fee to Audubon International, comply with the Plan's maintenance standards, and retain the services of a Natural Resource Manager whose duties will be to facilitate the Program. THE COSTS OF THE FOREGOING SHALL BE ASSESSED AGAINST THE OWNERS OF HOMESITES IN THE COMMUNITY AS PART OF THE ASSESSMENTS DESCRIBED IN SECTION 15.1 OF THE DECLARATION.

58.    Entry Feature.  Purchase acknowledges that entry feature plans for the Community depicted in marketing brochures and materials may not be approved by the applicable jurisdictional authorities and are therefore subject to revision.

59.    Blasting. ALL OWNERS, OCCUPANTS AND USERS OF THE COMMUNITY ARE HEREBY PLACED ON NOTICE THAT SELLER AND/OR ITS AGENTS, CONTRACTORS, SUBCONTRACTORS, LICENSEES AND OTHER DESIGNEES WILL BE, FROM TIME TO TIME, CONDUCTING BLASTING, EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR IN PROXIMITY TO THE COMMUNITY.  BY THE ACCEPTANCE OF THEIR DEED OR OTHER CONVEYANCE OR MORTGAGE, LEASEHOLD, LICENSE OR OTHER INTEREST, AND BY USING ANY PORTION OF THE COMMUNITY, EACH SUCH OWNER, OCCUPANT AND USER AUTOMATICALLY ACKNOWLEDGES, STIPULATES AND AGREES (i) THAT NONE OF THE AFORESAID ACTIVITIES SHALL BE DEEMED NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, HEREUNDER OR AT LAW GENERALLY, (ii) NOT TO ENTER

UPON, OR ALLOW THEIR CHILDREN OR OTHER PERSONS UNDER THEIR CONTROL OR DIRECTION TO ENTER UPON (REGARDLESS OF WHETHER SUCH ENTRY IS A TRESPASS OR OTHERWISE) ANY PROPERTY WITHIN OR IN PROXIMITY TO THE COMMUNITY WHERE SUCH ACTIVITY IS BEING CONDUCTED (EVEN IF NOT BEING ACTIVELY CONDUCTED AT THE TIME OF ENTRY, SUCH AS AT NIGHT OR OTHERWISE DURING NON-WORKING HOURS), (iii) SELLER AND THE OTHER AFORESAID RELATED PARTIES SHALL NOT BE LIABLE FOR ANY AND ALL LOSSES, DAMAGES (COMPENSATORY, CONSEQUENTIAL, PUNITIVE OR OTHERWISE), INJURIES OR DEATHS ARISING FROM OR RELATING TO THE AFORESAID ACTIVITIES, EXCEPT RESULTING DIRECTLY FROM SELLER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (iv) ANY PURCHASE OR USE OF ANY PORTION OF THE COMMUNITY HAS BEEN AND WILL BE MADE WITH FULL KNOWLEDGE OF THE FOREGOING AND (v) THIS ACKNOWLEDGMENT AND AGREEMENT IS A MATERIAL INDUCEMENT TO SELLER TO SELL, CONVEY, AND/OR ALLOW THE USE OF THE RESIDENCE. THIS SECTION SHALL SURVIVE THE CLOSING.

60.     CONSTRUCTION STAGING AREA.  Purchaser acknowledges and understands that there will be construction staging areas within the Community.  Further, Purchaser acknowledges and understands that the construction staging area will be, from time to time, relocated within the Community.

61.     CONSTRUCTION ACTIVITIES.  Purchaser is hereby placed on notice that Seller and/or its agents, contractors, subcontractors, licensees and other designees will be, from time to time, conducting excavation, construction and other activities within or in proximity to the Community.  By the acceptance of their deed or other conveyance or mortgage, leasehold, license or other interest, and by using any portion of the Community, each such owner, occupant and user automatically acknowledges, stipulates and agrees (i) that none of the aforesaid activities shall be deemed nuisances or noxious or offensive activities, hereunder or at law generally, (ii) not to enter upon, or allow their children or other persons under their control or direction to enter upon (regardless of whether such entry is a trespass or otherwise) any property within or in proximity to the Community where such activity is being conducted (even if not being actively conducted at the time of entry, such as at night or otherwise during non-working hours), (iii) Seller and the other aforesaid related parties shall not be liable for any and all losses, damages (compensatory, consequential, punitive or otherwise) injuries or deaths arising from or relating to the aforesaid activities, except resulting directly from Seller's gross negligence or willful misconduct, and (iv) any purchase or use of any portion of the Community has been and will be made with full knowledge of the foregoing.

62.     Lot Slopes.  Purchaser acknowledges and understands that all Homesites will be sloped in order to match the grade of the abutting property as required by the appropriate governmental authority.  The sloping may impact the design of exterior improvements including but not limited to pools, pool decks or pool cages.  Purchaser's selection's of options and/or upgrades that modify the footprint of an existing model or are added to the exterior of the Residence must be reviewed and approved by the Seller to insure an appropriate "lot fit."  Any selections that are not compatible with the sloping, as determined by Seller in its reasonable discretion, must be modified or withdrawn.

63.     USE OF FUTURE GOLF CLUB FACILITIES.  Purchaser acknowledges that Purchaser does not acquire any vested right or easement, prescriptive or otherwise, to use the Parkland Golf Club golf course and club facilities that may be constructed by Seller in the Community ("Future Golf Club Facilities" or "Future Golf Club") by purchasing the Lot or by acquiring membership in the Foundation (or any other property owners' association), nor does Purchaser acquire any ownership or membership interest in the Future Golf Club Facilities.  Purchaser acknowledges that no representations have been made to Purchaser regarding use of the Future Golf Club Facilities now or in the future, other than as set forth herein.  Purchaser agrees to execute at Closing the Statement by Purchaser Concerning Use of Future Golf Club Facilities at Parkland Golf & Country Club in the form attached hereto as **Exhibit 15.**  Memberships entitling use of the Future Golf Club Facilities will be offered in accordance with the rules and regulations of the Future Golf Club Facilities (hereinafter "Rules").  Purchaser acknowledges the Rules may be amended from time to time in the sole discretion of the Future Golf Club.  The owner(s) of the Future Golf Club shall have the right to modify the future Golf Club Facilities and/or the use rights with respect thereto, including, without limitation, to: the right to approve members and determine eligibility; reserve use rights for future purchasers within the Community; terminate any or all use privileges; change, eliminate or cease operating the Future Golf Club Facilities; transfer or sell any or all of the Future Golf Club Facilities or operation thereof to any other party and on any terms; limit the availability of use privileges and require the payment of a purchase price, membership contribution, initiation fee, initiation deposit, dues and/or other charges for use privileges.

64.     OFF-SITE COMMERCIAL PROPERTY.  A portion of the Community is bounded by property designated for commercial use.  Seller makes no representations or warranties as to the noise level, traffic, lighting conditions or any other impact or nuisance that may be created by the construction or general public's use of the off-site commercial property.

65.     SPORTS CLUB.  All capitalized terms not otherwise defined in this Section 65 shall have the meaning ascribed to such terms in the Sports Club Plan.  Each Purchaser of a Residence has use rights in the Sports Club Facilities pursuant to the Sports Club Plan.  The Sports Club Plan outlines the terms pursuant to which the Parkland Golf & Country Club Foundation  may purchase the Sports Club Facilities and Sports Club Property and assess owners therefore, each Purchaser's obligation to pay License Fees and a pro rata portion of the Sports Club Expenses, and how License Fees increase.  Purchaser also understands and agrees that a failure to pay Sports Club Payments when due could cause Sports Club Owner to record a lien on the Residence and to foreclose such lien. At this time the Sports Club Owner is the same entity as Seller.  Purchaser is further advised as follows:

        65.1    Sports Club Owner has constructed or will construct, at its sole cost and expense, certain recreation facilities as described in the Sports Club Plan together with such other equipment, facilities, personalty, as Sports Club Owner determines in its sole discretion.  Sports Club Owner shall comply with City of Parkland

Legal\contracts\parkland golf & country club\contract v9
3/4/05

13 of 16

Ordinance No. 2002-04, as amended from time to time ("Ordinance"). The Ordinance currently requires commencement of construction of the golf course and the country club social/fitness facility including temporary golf club facilities prior to the issuance of the 100th Certificate of Occupancy and shall complete construction of all such facilities within two (2) years from the date the first building permit is issued for any of the country club social/fitness facility subject only to delay incurred by reason of acts of God, unless such requirement shall be waived or modified by the City of Parkland.

65.2    The Sports Club Facilities shall be used and enjoyed by the Purchaser, on a non-exclusive basis, in common with such other persons, entities, and corporations that may be entitled to use the Sports Club Facilities under the terms in the Sports Club Plan.

65.3    Purchaser acknowledges that the Sports Club Plan provides that each Purchaser becomes directly liable for the Sports Club Payments, including the License Fee to be paid to the Sports Club Owner, all as set forth in the Sports Club Plan. Purchaser acknowledges receipt of the Parkland Golf & Country Club Estimated Operating Budget, which specifically discloses the initial Sports Club Payments. Purchaser acknowledges that all sums due pursuant to the Sports Club Plan in regard to the Sports Club Facilities and Sports Club Property are direct obligations of Purchaser and are secured by a lien against the Residence. Failure to pay such sums may result in foreclosure of the lien.

65.4    By accepting a Special Warranty Deed to a Residence, Purchaser acknowledges that: (i) it is in the best interest of Purchaser, Foundation, and the Community, as a whole, and property values therein, to provide for the Sports Club Facilities to be located within the Parkland Golf &Country Club Community, (ii) the terms of the Sports Club Plan relating to the Sports Club Facilities and Sports Club Property and the Sports Club Payments imposed thereby, including the License Fee, are fair and reasonable given the nature of the Sports Club Facilities provided and the cost thereof; (iii) there were significant other housing opportunities available to the Purchaser in the general location of the Community, both with and without Sports Club Facilities; (iv) the Sports Club, and the right to use the Sports Club were, for purposes of this acknowledgment, important to the Purchaser and Purchaser would not have purchased the Residence without the right to use the Sports Club Facilities; (v) full disclosure of the nature of the Sports Club Facilities and Sports Club Property and obligations associated therewith was included in the Sports Club Plan given to Purchaser prior to Purchaser executing the Contract; (vi) the fact that the Sports Club Owner is, or may be, affiliated with the Seller, is acknowledged; and (vii) the provisions of the Sports Club Plan do not grant any ownership rights in the Sports Club Facilities or Sports Club Property in favor of the Foundation or Owner but, rather, grant a non-exclusive license to use the Sports Club Facilities subject to full compliance with all obligations imposed on each of them relating thereto.

66.    Construction Lien Disclosure. In accordance with Section 8 of this Contract, Seller is required to convey title to the Residence free and clear of any construction liens resulting from the Seller's construction of the Residence. However, Seller is required to provide Purchaser with the following disclosure pursuant to Section 713.015, Florida Statutes:

**ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND ARE NOT PAID IN FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS OR NEGLECTS TO MAKE OTHER LEGALLY REQUIRED PAYMENTS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL**

**TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY. FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX AND IT IS RECOMMENDED THAT WHENEVER A SPECIFIC PROBLEM ARISES, YOU CONSULT AN ATTORNEY.**

67.   CONSTRUCTION DEFECTS DISCLOSURE.  FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL, A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND GUIDELINES UNDER FLORIDA LAW.

68.   HOMEOWNERS' ASSOCIATION DISCLOSURE SUMMARY.  Exhibit 8 hereto contains The Homeowners' Association Disclosure Summary for Parkland Golf & Country Club (2004). PURCHASER SHOULD NOT EXECUTE THIS CONTRACT UNTIL PURCHASER HAS RECEIVED AND READ THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401 and 720.601, FLORIDA STATUTES. Pursuant to Section 720.401 and 720.601, Florida Statutes, the following disclosure is hereby provided:

IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401 and 720.601, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.

69.   INCENTIVES ACKNOWLEDGEMENT. Purchaser acknowledges and understands that Seller may, from time to time, pay or provide certain bonuses, gifts, rewards, or sales incentives to Seller's salespeople, which bonuses, gifts, rewards and sales incentives are attributable to broad promotional programs of a community or company-wide basis and not directly related to the consummation of the transaction contemplated herein. In such instances, Purchaser acknowledges that the payment or disposition of such bonuses, gifts, rewards and sales incentives will be handled internally between Seller and the applicable salesperson and may not be disclosed to Purchaser.

70.   SPECIAL TAXING DISTRICT. THE NORTH SPRINGS IMPROVEMENT DISTRICT MAY IMPOSE AND LEVY TAXES OR ASSESSMENTS, OR BOTH TAXES AND ASSESSMENTS, ON THIS PROPERTY. THESE TAXES AND ASSESSMENTS PAY THE CONSTRUCTION, OPERATION, AND MAINTENANCE COSTS OF CERTAIN PUBLIC FACILITIES AND SERVICES OF THE DISTRICT AND ARE SET ANNUALLY BY THE GOVERNING BOARD OF THE DISTRICT. THESE TAXES AND ASSESSMENTS ARE IN ADDITION TO COUNTY AND OTHER LOCAL GOVERNMENTAL TAXES AND ASSESSMENTS AND ALL OTHER TAXES AND ASSESSMENTS PROVIDED BY LAW.

The parties have executed this Contract on the date set below their respective names.

PURCHASER(S):

Print Name: _HANNAH BATTER_                 Print Name: _____

Date: _10/2/05_                                              Date: _____

Legal\contracts\parkland golf & country club\contract v9
3/4/05

15 of 16

ACCEPTED this _2nd_ day of _October_, _2005_ by Seller.

                                          WCI COMMUNITIES, INC., a Delaware
                                          corporation

                                          By: _____

                                          Print Name: _____

                                          Title: _____

(SELLER EXECUTES BELOW IF PURCHASER WAIVES ESCROW RIGHT PURSUANT TO SECTION
4 OF THIS CONTRACT)

Pursuant to the terms of Section 4 herein, WCI COMMUNITIES, INC., hereby acknowledges receipt of the deposit
in the amount of $_____ (subject to clearance of funds) this _____ day of _____, _____.

                               WCI COMMUNITIES, INC., a Delaware corporation

                               By: _____

                               Title: _____

                                     OR

(SELLER EXECUTES BELOW IF PURCHASER DOES NOT WAIVE ESCROW RIGHT PURSUANT TO
SECTION 4 OF THIS CONTRACT.)

Pursuant to the terms of Section 4 herein, WCI Realty, Inc. hereby acknowledges receipt of the deposit in the
amount of $_____ (subject to clearance of funds) this _____ day of _____, _____.

                               ESCROW AGENT
                               WCI REALTY, INC.

                               By: _____

                               Title: _____

WCI Sales Associate: _____

                Printed Name: _____

Co-Broker/Associate: _____
                       Broker Name / Associate Name

                     Print Name: _____

# Exhibit

# "B"

# Joseph E. Altschul, LLC

**Attorney at Law**
**2717 W. Cypress Creek Road**
**Fort Lauderdale, FL 33309**
**Telephone:  (954) 556-4821**
**Fax:  (954) 343-5600**

April 24, 2007

WCI Communities, Inc.                                    WCI Communities, Inc.
1575 Heron Bay Blvd., # 200                       24301 Walder Center Drive
Coral Springs, FL 33076                               Bonita Springs, FL 34134

      **Re:    Parkland Golf & Country Club, Residence 9/R**
              **Purchaser:  Hannah Batihk**

Dear Sir or Madam:

I have been retained by Hannah Batihk in connection with the October 2, 2005 contract (the "Contract") to purchase Residence 9/R of the Parkland Golf & Country Club (the "Property").  I am in receipt of your correspondence to Ms. Batihk dated March 28, 2007 declaring her in default of the Contract and stating that you intend to retain her security deposit, in excess of $106,000.00, as "liquidated damages."

Be advised that, pursuant to the Interstate Land Sales Full Disclosure Act (15 U.S.C. §§ 1701-20) ("ILSFDA"), Ms. Batihk hereby revokes the Contract due to your failure to provide her with a property report compliant with federal law prior to her execution of the Contract.

While I am aware that the drafters of the Contract attempted to draft the contract so that it would be exempt from the federal statutory scheme, the Contract is nonetheless subject to the ILSFDA because the developer retained the right to "re-plat, re-subdivide, and re-configure" the Property in paragraph 18 of the Contract.  This reservation of rights renders the developer's obligation to complete construction within two years wholly illusory.

In addition, Ms. Batihk informed you that her ability to purchase the Property was contingent upon her getting financing.  Your sales representative advised Ms. Batihk, immediately prior to her entry into the Contract, that this would not be an issue and the Contract would be contingent upon financing, and just as importantly, that Ms. Batihk could very easily "flip" the Property to another purchaser for a profit if she desired or was not approved for financing.  Ms. Batihk entered into the Contract based on these representations and assurances.  Ms. Batihk subsequently was denied financing and did not close on the Property.

Accordingly, demand is hereby made that you immediately return to Ms. Batihk all deposits made by her for the purchase of the Property, an amount of approximately $106,399.00. If you do not return Ms. Batihk's deposit to her within 10 days from the date of this letter, I have been authorized by Ms. Batihk to pursue all rights and remedies available to her under both Florida and Federal law.

PLEASE GOVERN YOURSELF ACCORDINGLY.

Very truly yours,

Joseph E. Altschul

cc     Ms. Hannah Batihk

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Hannah Batihk | Revier Real Estate Corp. and WCI Communities, Inc. |

07-61885 CIV-COOKE

**(b)** County of Residence of First Listed Plaintiff  Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Joseph E. Altschul, Esq.
2717 W. Cypress Creek Road
Fort Lauderdale, FL 33309

Attorneys (If Known)

07 cv 61885 Cooke/Brown

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE  ☐ MONROE  ☑ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☒ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):
a) Re-filed Case ☐ YES ☐ NO    b) Related Cases ☐ YES ☐ NO

JUDGE                    DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

15 U.S.C. § 1701 et ceq - claims under Interstate Land Sales Full Disclosure Act and Pendant state law claims

LENGTH OF TRIAL via 1 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 126,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE

FOR OFFICE USE ONLY
AMOUNT $350.00   RECEIPT # 54/871   IFP